# TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION



### Status of Actions Taken to Improve the Processing of Tax-Exempt Applications Involving Political Campaign Intervention

**March 27, 2015**

**Reference Number:  2015-10-025**

This report has cleared the Treasury Inspector General for Tax Administration disclosure review process and information determined to be restricted from public release has been redacted from this document.

**Redaction Legend:**
1 = Tax Return/Return Information

**Phone Number  /  202-622-6500**
**E-mail Address  /  TIGTACommunications@tigta.treas.gov**
**Website  /  http://www.treasury.gov/tigta**

Government Exhibit
A



# *HIGHLIGHTS*

**STATUS OF ACTIONS TAKEN TO IMPROVE THE PROCESSING OF TAX-EXEMPT APPLICATIONS INVOLVING POLITICAL CAMPAIGN INTERVENTION**

# Highlights

## Final Report issued on March 27, 2015

Highlights of Reference Number:  2015-10-025 to the Internal Revenue Service Commissioner for the Tax Exempt and Government Entities Division.

## IMPACT ON TAXPAYERS

In a prior audit, TIGTA found that ineffective management resulted in 1) inappropriate criteria being used to identify for review organizations applying for tax-exempt status based on names and policy positions instead of indications of political campaign intervention, 2) substantially delayed processing of certain applications, and 3) unnecessary information requests being issued.  Recommendations from the prior audit were made to help ensure that applications for tax-exempt status are processed in a fair, impartial, and timely manner.

## WHY TIGTA DID THE AUDIT

The overall objective of this audit was to assess the IRS's actions in response to TIGTA's recommendations to improve the identification and processing of applications for tax-exempt status involving political campaign intervention.

## WHAT TIGTA FOUND

The IRS has taken significant actions to eliminate the selection of potential political cases based on names and policy positions, expedite processing of Internal Revenue Code (I.R.C.) Section (§) 501(c)(4) social welfare organization applications, and eliminate unnecessary information requests.

First, the IRS eliminated the use of Be On the Look Out (BOLO) listings, which TIGTA determined had contained inappropriate criteria regarding political advocacy cases.  TIGTA conducted interviews with a random sample of employees, who confirmed that BOLOs or similar listings were no longer being used.

Second, the Exempt Organizations function completed processing for 149 of the 160 applications for tax-exempt status that, as of December 2012, had been open for lengthy periods.  To expedite processing of I.R.C. § 501(c)(4) social welfare applications, the IRS developed an optional expedited self-certification process.  This expedited process is not available to other types of organizations, *e.g.*, labor organizations and business leagues, with similar political campaign intervention limitations.

Third, the IRS has developed preapproved questions and has instituted a quality review process to provide better assurance that unnecessary information requests are not sent to applicants.

The Department of the Treasury is revising draft guidance to address how to measure the "primary activity" of social welfare organizations.  Until this guidance is finalized, the IRS does not have a clearly defined test for determining whether an organization's request for exemption as a social welfare organization should be approved.  As a result, for those applicants not choosing the optional expedited process, the IRS continues to use a subjective facts and circumstances process.

## WHAT TIGTA RECOMMENDED

TIGTA recommended that the IRS take action to improve the timing and execution of future training.  In addition, if the optional expedited self-certification process for I.R.C. § 501(c)(4) organizations becomes a permanent process, the IRS should consider providing this option to additional organizations with similar political campaign intervention limitations.

In their response to our report, IRS management agreed with both recommendations.  The IRS plans to improve the timing and execution of future training and consider extending the optional expedited process to other types of organizations, if it becomes a permanent process.



**TREASURY INSPECTOR GENERAL
FOR TAX ADMINISTRATION**

**DEPARTMENT OF THE TREASURY**

**WASHINGTON, D.C. 20220**

March 27, 2015

**MEMORANDUM FOR** COMMISSIONER, TAX EXEMPT AND GOVERNMENT ENTITIES
DIVISION

**FROM:**    Michael E. McKenney
      Deputy Inspector General for Audit

**SUBJECT:**   Final Audit Report – Status of Actions Taken to Improve the
      Processing of Tax-Exempt Applications Involving Political Campaign
      Intervention (Audit # 201410009)

This report presents the results of our review to assess the Internal Revenue Service's (IRS)
actions in response to the Treasury Inspector General for Tax Administration's (TIGTA)
recommendations[1] to improve the identification and processing of applications for tax-exempt
status involving political campaign intervention.  This review is included in our Fiscal Year 2015
Annual Audit Plan and addresses the major management challenge of Tax Compliance
Initiatives.

Management's complete response to the draft report is included as Appendix VI.

Copies of this report are also being sent to the IRS managers affected by the report
recommendations.  If you have any questions, please contact me or Gregory D. Kutz, Assistant
Inspector General for Audit (Management Services and Exempt Organizations).

---

[1] TIGTA, Ref. No. 2013-10-053, *Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review*
(May 2013).



***Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention***

# *Table of Contents*

**Background** ..................................................................................................Page   1

**Results of Review** ........................................................................................Page   2

Significant Actions Have Been Taken to Address
Prior Audit Recommendations....................................................................Page   2

Recommendation 1:.........................................................Page 11

Recommendation 2:.........................................................Page 16

**Appendices**

Appendix I – Detailed Objective, Scope, and Methodology ........................Page 20

Appendix II – Major Contributors to This Report ........................................Page 24

Appendix III – Report Distribution List ......................................................Page 25

Appendix IV – Letter 5228 ...........................................................................Page 26

Appendix V – Glossary of Terms .................................................................Page 30

Appendix VI – Management's Response to the Draft Report .....................Page 32



***Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention***

# *Abbreviations*

| | |
|---|---|
| BOLO | Be On the Look Out |
| EO | Exempt Organizations |
| I.R.C. | Internal Revenue Code |
| IRS | Internal Revenue Service |
| TIGTA | Treasury Inspector General for Tax Administration |



**Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention**

# Background

In a May 2013 audit report,[1] the Treasury Inspector General for Tax Administration (TIGTA) determined that the Internal Revenue Service (IRS) used inappropriate criteria that identified for review organizations applying for tax-exempt status based upon their names or policy positions instead of indications of potential political campaign intervention.[2]  These applications (hereafter referred to as potential political cases)[3] were forwarded to a team of specialists[4] for review.  We reported that ineffective management:  1) allowed inappropriate criteria to be developed and stay in place for more than 18 months, 2) resulted in substantial delays in processing certain applications, and 3) allowed unnecessary information requests to be issued.  As a result, TIGTA made nine recommendations to provide reasonable assurance that applications are processed in a fair and impartial manner in the future without unreasonable delay.

The results of this follow-up report are based on audit work performed at the Exempt Organizations (EO) function offices in Washington, D.C., and Cincinnati, Ohio, during the period November 2013 through November 2014.  During the time frame leading up to this audit and during this audit, the IRS was making other changes to the tax-exempt application process that went beyond the audit process covered in our prior audit.  This audit focused only on actions taken that were relevant to our prior nine recommendations.

We conducted this performance audit in accordance with generally accepted government auditing standards.  Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objective.  We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objective.  Detailed information on our audit objective, scope, and methodology is presented in Appendix I.  Major contributors to the report are listed in Appendix II.

---

[1] TIGTA, Ref. No. 2013-10-053, *Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review* (May 2013).
[2] For the definition of "political campaign intervention" and other terms, see Appendix V.
[3] Until July 2011, the Exempt Organizations Rulings and Agreements office referred to these cases as Tea Party cases.  Afterwards, the Exempt Organizations function referred to these cases as advocacy cases.
[4] Initially, the team consisted of one specialist, but it was expanded to several specialists in December 2011. The Exempt Organizations function referred to this team as the Advocacy team.



**Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention**

# Results of Review

## Significant Actions Have Been Taken to Address Prior Audit Recommendations

The IRS has taken significant actions to address the nine recommendations made in our prior audit report. These actions are designed to: 1) eliminate the selection of potential political cases based on names and policy positions, 2) expedite processing of Internal Revenue Code (I.R.C.) Section (§) 501(c)(4) social welfare organization applications, and 3) eliminate unnecessary information requests. The following provides our detailed analysis of corrective actions taken by the IRS on all nine recommendations.

### The IRS has taken adequate corrective actions to address Prior Recommendation 1

**Prior Recommendation 1:** *Ensure that the memorandum requiring the Director, Rulings and Agreements, to approve all original entries and changes to criteria included on the Be On the Look Out listing prior to implementation be formalized in the appropriate Internal Revenue Manual.*

**Prior audit results**

The IRS developed and began using criteria to identify potential political cases for review that inappropriately identified specific groups applying for tax-exempt status based on their names or policy positions instead of developing criteria based on tax-exempt laws and Treasury Regulations. In August 2010, the criteria for potential political cases in the first Be On the Look Out (BOLO) listing were "Tea Party organizations applying for I.R.C. Section (§) 501(c)(3) or I.R.C. § 501(c)(4) status." This criterion was included on the BOLO listing as an emerging issue. EO function officials stated that Determinations Unit specialists interpreted the general criteria in the BOLO listing and developed expanded criteria for identifying potential political cases. The expanded criteria included additional names as well as policy positions espoused by organizations in their applications.

The Determinations Unit developed and implemented inappropriate criteria in part due to insufficient oversight provided by management. For example, only front-line management approved references to the Tea Party criteria contained in the BOLO listing before it was implemented. In May 2012, the Director, Rulings and Agreements, issued a memorandum requiring all original entries and changes to criteria included on the BOLO listings be approved at the executive level prior to implementation.



***Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention***

## Current audit results

On June 20, 2013, the IRS issued a memorandum suspending the use of the BOLO listings and other listing used to identify cases or issues (including emerging issues) for further review.  The IRS's 30-day report issued on June 24, 2013, and an August 9, 2013, memorandum also included this guidance and further stated that, "In the absence of

> ***Soon after the release
> of TIGTA's prior report,
> the IRS suspended the
> use of BOLO listings.***

BOLO lists, the Determinations Unit will continue to screen[5] for information affecting the determination of applications for tax-exempt status, including activity tied to political campaign intervention, but it will be done without regard to specific labels of any kind."  In addition, references to the BOLO listings and another previously used criteria listing[6] were removed from the Internal Revenue Manual.

We interviewed a statistically valid sample of 85 Determinations Unit employees to determine if they:  1) were still using BOLO listings or other similar listings to identify cases or issues for further review and 2) knew the factors or criteria that should and should not be considered when reviewing a potential political case.  All of the employees stated that they were not using BOLO or similar listings, nor did they know of anyone else using such listings.[7]  In addition, 83 (98 percent) of 85 Determinations Unit employees responded that they only considered the activities and/or facts and circumstances of each case or used interim guidance[8] when determining if there was potential political campaign intervention.  The other two employees stated that they did not know what criteria to use to identify potential political campaign intervention.

In the absence of BOLO listings containing emerging issues, the EO function, in September 2013, issued a memorandum creating a committee to serve as the central point of contact within the EO function to screen, review, and monitor emerging issue referrals and to make appropriate recommendations regarding them.  Emerging issues include matters involving abusive transactions, fraud, antiterrorism, large cases, and complex or sensitive issues[9] for which guidance is needed and require coordination within, and in some instances outside of, the EO function.

---

[5] The IRS indefinitely suspended screening of applications in February 2014.
[6] A similar listing, known as the Touch and Go listing, was used prior to the implementation of the BOLO listing in Calendar Year 2010.
[7] See Appendix I for our sampling methodology.
[8] Interim Guidance Memorandum on Initial Classification of Applications, dated September 30, 2013.  This memorandum provided procedures that screening is based on facts and circumstances of the stated activities rather than the name or labels of the organization.
[9] Political campaign intervention issues would be considered under complex or sensitive issues.



**Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention**

We reviewed the Emerging Issues Committee charter and related procedures and confirmed that EO function senior managers on the committee determine if emerging issues require further development. This elevates the review process above the front-line manager level in the Determinations Unit. In addition, we reviewed committee meeting minutes and resulting referrals. All of the documentation we reviewed indicates that decisions on referrals containing emerging issues are being made based upon activities and not names or policy positions. Since decisions are made by a committee and not a single front-line manager, as we found in our previous audit, the approvals provide increased assurance that emerging issues are being considered impartially.

### The IRS has taken adequate corrective actions to address Prior Recommendation 2

**Prior Recommendation 2:** *Develop procedures to better document the reason(s) applications are chosen for review by the team of specialists, e.g., evidence of specific political campaign intervention in the application file or specific reasons the EO function may have for choosing to review the application further based on past experience.*

**Prior audit results**

We reviewed all 298 applications that had been identified as potential political cases as of May 31, 2012, and sent them to the team of specialists. In the majority of cases, we agreed that the applications submitted included indications of significant political campaign intervention. However, we did not identify indications of significant political campaign intervention for 91 (31 percent) of the 296 applications[10] that had complete documentation. Applications that were forwarded to the team of specialists experienced substantial delays in processing, and some organizations received additional request letters asking for unnecessary information.

We discussed our results with EO function officials, who disagreed with our findings regarding applications for which we did not identify indications of significant political campaign intervention. Although EO function officials provided explanations about why the applications should have been identified as potential political cases, the case files did not include the specific reason(s) the applications were selected. To provide further assurance that Determinations Unit employees are handling tax matters in an impartial manner, we concluded that the IRS should specifically document why applications are chosen for further review for potential significant political campaign intervention.

---

[10] We could not complete our review of two cases due to inadequate documentation in the case files.



**Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention**

<u>**Current audit results**</u>

The IRS has substantially changed its procedures for processing applications for tax-exempt status since our prior audit.  We believe that the current procedures address our original concern that only applications with indications of significant political campaign intervention should be worked as potential political cases and the basis for selection should be clearly documented in the file.  In early Calendar Year 2014, the IRS issued an interim guidance memorandum indefinitely suspending the process of screening applications for tax-exempt status and no longer assigns applications with indications of significant political campaign intervention to a specific team of specialists in the Determinations Unit for processing.[11]  Instead, the IRS developed different processes for I.R.C. §§ 501(c)(3) and 501(c)(4) applications.

IRS officials stated that I.R.C. § 501(c)(3)[12] applications with indications of political campaign intervention can be worked by any grade level 12 or higher Determinations Unit specialist because Determinations Unit specialists have now been trained on how to identify and process potential political cases.[13]  In addition, group managers and independent Quality Assurance personnel are required to review additional information request letters and related case files before the letters are sent to organizations to determine whether the scope of the requests are appropriate.  The addition of independent reviewers to evaluate the scope of additional information requests provides greater assurance that these requests are necessary and contain only relevant questions.

For I.R.C. § 501(c)(4) applications, the IRS designed an optional expedited process[14] in which Determinations Unit specialists send a letter to organizations whose applications include indications of political campaign intervention.[15]  Organizations can choose to make representations to the IRS under penalties of perjury regarding their past, current, and future activities and receive a determination letter based on those representations.  Figure 1 shows the specific representations that applicants must make under penalties of perjury.

---

[11] As we were concluding our audit work, the EO function issued guidance to formally end the screening process and allow Determinations Unit employees to work any cases which are appropriate for their grade level.

[12] I.R.C. § 501(c)(3) charitable organizations are prohibited from directly or indirectly participating in or intervening in any political campaign on behalf of or in opposition to any candidate for public office.

[13] Training is discussed in more detail under the Prior Recommendations 3, 6, and 9 subheading.

[14] As of the end of our fieldwork, the guidance document relating to the optional expedited process had not been incorporated into the Internal Revenue Manual.

[15] Before a letter can be sent to an organization, the IRS must determine that there are no other outstanding issues surrounding tax-exempt status except for political campaign intervention.



**Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention**

**Figure 1:  Letter 5228 Representations Regarding
Past, Present, and Future Activities for I.R.C. § 501(c)(4) Applicants**

During each past year of the organization, during the current tax year, and during each future tax year in which the organization intends to rely on a determination letter issued under the optional expedited process, the organization has spent and anticipates that it will spend 60 percent or more of *both* the organization's total expenditures *and* its total time (measured by employee and volunteer hours) on activities that promote social welfare (within the meaning of Section 501(c)(4) and the regulations thereunder).

During each past tax year of the organization, during the current tax year, and during each future tax year in which the organization intends to rely on a determination letter issued under the optional expedited process, the organization has spent and anticipates that it will spend 40 percent or less of both the organization's total expenditures and its total time (measured by employee and volunteer hours) on direct or indirect participation or intervention in any political campaign on behalf of (or in opposition to) any candidate for public office (within the meaning of the regulations under Section 501(c)(4)).

*Source:  IRS Letter 5228.  See Appendix IV for the complete letter.*

If an organization chooses not to make the representation, the application is transferred to the Technical Unit to independently analyze the application before contacting the applicant for additional information.  As of October 7, 2014, 12 applications were received and worked by the Technical Unit since this process was extended to all organizations applying for tax-exempt status under I.R.C. § 501(c)(4) in December 2013.  We reviewed the case files of these applications.  There were indications of potential political campaign intervention documented in ****1***** case files before the case was transferred to the Technical Unit for review.  ***1*** ****************************************1************************************* ****************************************1********************************** ********************1*********************************.[16]  The addition of an independent review of applications by tax law specialists in the Technical Unit provides greater assurance that only applications for tax-exempt status that contain indications of political campaign intervention are worked as potential political cases.[17]

---

[16] *****************************************1***********************************************.

[17] As we were concluding our audit work, the IRS informed us that portions of the interim guidance will be included in the Internal Revenue Manual, but cases will no longer be worked in the Technical Unit due to an organizational realignment.  Guidance on the revised process had not been issued when we concluded our audit work.



*Status of Actions Taken to Improve*
*the Processing of Tax-Exempt Applications*
*Involving Political Campaign Intervention*

## *The IRS completed corrective actions to address Prior Recommendations 3, 6, and 9; however, actions should be taken to improve the timing and execution of future training*

### Prior Recommendations 3, 6, and 9:

- *Recommendation 3:  Develop training or workshops to be held before each election cycle including, but not limited to, the proper ways to identify applications that require review of political campaign intervention.*

- *Recommendation 6:  Develop training or workshops to be held before each election cycle including, but not limited to a) what constitutes political campaign intervention versus general advocacy (including case examples) and b) the ability to refer for follow-up those organizations that may conduct activities in a future year which may cause them to lose their tax-exempt status.*

- *Recommendation 9:  Develop training or workshops to be held before each election cycle including, but not limited to, how to word questions in additional information request letters and what additional information should be requested.*

### Prior audit results

The IRS used inappropriate criteria to identify tax-exempt applications for review.  The criteria focused narrowly on the names and policy positions of organizations instead of tax-exempt laws and Treasury Regulations.  In addition, an internal IRS review determined that there appeared to be some confusion by Determinations Unit specialists and applicants on what activities are allowed by I.R.C. § 501(c)(4) organizations.  The IRS also referred some applications that were approved to another unit for follow-up.[18]  Lastly, we determined that the Determinations Unit sent requests for information that we later (in whole or in part) determined to be unnecessary for 98 (58 percent) of 170 organizations.  This information was requested because employees lacked sufficient guidance and there were no managerial reviews of questions before additional information requests were sent to organizations seeking tax-exempt status.

### Current audit results

The IRS developed and provided extensive political campaign intervention training for relevant Rulings and Agreements office employees, including all Determinations Unit employees.[19]  In addition to providing written materials to its staff, the IRS developed virtual e-Learning sessions using web-based software as well as smaller technical workshops held in face-to-face settings to address potential political campaign intervention.

---

[18] The IRS has changed this process since the issuance of our prior report.  Organizations are now referred to the EO function Examinations Classification Unit for an assessment of whether an examination of the organization is warranted.
[19] The training was held between May and August 2014.



***Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention***

The required training appropriately addressed:  1) the use of activities, instead of names and policy positions, to identify applications for further review, 2) what constitutes political campaign intervention versus general advocacy, 3) the type of additional information that should be requested and the appropriate wording of questions in additional information request letters, and 4) a change in process for referring organizations to the EO function Examinations office.[20] In addition, this training included a detailed case study with handouts and exercises the staff was asked to complete related to organizations seeking tax-exempt status under I.R.C. §§ 501(c)(3) and 501(c)(4) and how to address issues presented in the case study to determine if potential political campaign intervention is indicated in the application.  The case study was subsequently discussed in the smaller individual group sessions.

Although the IRS addressed our prior recommendations regarding training, we identified additional steps the IRS should take to improve upon the timing and execution of the training.

*Training may not be offered timely*

The IRS provided initial training to its staff and plans to provide recurring training before each election, as we recommended.  However, the EO function only completed training employees in late August 2014.  While that is understandable because the IRS had to develop the training and the election cycle was already underway, we are concerned about the timing of the training going forward.  EO function officials informed us that political campaign intervention training will be incorporated into their fiscal year training plan, and they plan to complete training prior to the end of June in each year with a Federal general election.  We believe this may be too late in the election cycle for the training to be useful, as organizations involved in campaign-related activities may apply for tax-exempt status much earlier in the election cycle.

In order for training to be effective, it needs to be delivered timely.  According to Office of Personnel Management guidance, "Federal agencies must be agile in their delivery of 'just-in-time' training to meet rapidly changing responsibilities and assignments."  In addition, IRS Policy Statement 6-55 states that the IRS shall "...within the limits of appropriated funds, make available to its employees all training determined by appropriate levels of management to be needed for effective performance...."

*Monitoring of attendance could be improved*

As of August 27, 2014, 173 (79 percent) of 219[21] personnel required to take the political campaign intervention training have completed all of the training sessions.  The remaining

---

[20] Previously, some applications were approved and referred for follow-up to the Review of Operations Unit because the IRS suspected that the organization's activities might jeopardize its tax-exempt status but did not have sufficient cause to deny exemption.  These applications are now referred to the EO function Examinations Classification Unit, consistent with all other internal referrals.
[21] The IRS stated that one employee was on extended medical leave.



*Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention*

46 employees did not complete one or more of the training sessions (nine employees) and/or did not attend the training sessions for the required amount of time (40 employees).[22]

The Tax Exempt and Government Entities Division Learning and Education office gave employees credit for attending if they attended all of the sessions, with a 10-minute grace period for each session. Staff overseeing training would compare the exact length of time of the session to how long the employee was connected to the web-based software. Employees were advised when they had not met the attendance requirement and were asked to go back into the software and listen to the part of the recording they had missed to complete the required training.

However, this methodology did not identify all employees who missed certain segments. Our analysis of the attendance records, for the 40 employees who did not attend the training sessions for the required amount of time, showed that employees:

- Signed onto the session in advance of the start time and were credited with attending the session when they had missed more than 10 minutes.

- Signed on more than 10 minutes after the training session started but stayed connected to the system after the training ended.

- Disconnected in the middle of the session, which resulted in gaps in the training that exceeded 10 minutes.

- Did not complete watching replays of the training sessions.

Figure 2 shows that most of the 40 employees missed only 11 to 15 minutes of a training session, while other employees missed more of the training.

---

[22] Three employees did not complete a training session and did not attend another session for the required length of time. Therefore, these numbers will not add up to 46.



**Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention**

### Figure 2:  Amount of Training Time Missed by Employees

[Bar chart titled "Missed Training (in minutes)" with y-axis labeled "Number of Employees" ranging from 0 to 25. The first bar (11 to 15) reaches about 25. The bars for 16 to 20, 21 to 25, 26 to 30, and 31 to 35 each reach about 5. The bar for 36+ reaches about 2.]

Legend: ■ 11 to 15  ■ 16 to 20  ■ 21 to 25  ■ 26 to 30  ■ 31 to 35  ■ 36+

*Source:  TIGTA analysis of IRS training records.*

If employees miss key portions of training sessions, they may not have the knowledge needed to effectively and efficiently carry out their responsibilities.  Accurate monitoring of training attendance is essential to ensure that the staff is adequately trained to identify issues involving political campaign intervention.

After reviewing our analysis, IRS officials responded that they thought a 15-minute grace period was acceptable for these sessions instead of the 10-minute grace period previously used.  IRS officials stated that this extended grace period was in part due to issues involved with a large number of employees attempting to log in to training sessions at the same time.  IRS officials also stated that they would direct those employees missing more than 15 minutes of any session to retake the sessions.

*The Learning and Education office did not evaluate the effectiveness of the training*

We determined that the IRS did not complete the process designed to evaluate the effectiveness of the training.  Each of the training modules developed in response to our recommendations contained an "Evaluation Process" section describing the process that would be used to evaluate the training.  This process, in accordance with IRS policy, requires evaluation of the process in phases.

As part of the Level 1 phase (Learner Reaction), the Learning and Education office solicited informal feedback (four questions) from the staff immediately at the completion of each of the training sessions so that presenters could get immediate feedback.  Formal evaluation of the sessions should have been sent out to the participants once the recordation of the training was complete on IRS tracking systems (within a week of course completion).  However, IRS officials informed us that training evaluations were not automatically sent to employees after training was completed because of an oversight when inputting the courses into the training system.  Once the



*Status of Actions Taken to Improve*
*the Processing of Tax-Exempt Applications*
*Involving Political Campaign Intervention*

oversight was discovered, management did not believe asking employees to complete the surveys would be an effective use of resources and time due to the time that had passed and the quality of the information received from the informal feedback.

In addition, the Learning and Education office did not compile or evaluate case study results completed by students to determine if they learned skills and acquired knowledge as a result of the training. This phase of the evaluation process is referred to as Level 2 feedback (Learner Achievement). Learning and Education office officials stated that they did not consider reviewing the results of the case study when conducting the Level 2 evaluation at the time of the training. As we were completing our audit fieldwork, management informed us that they would be performing a Level 3 evaluation (Impact on Job Performance).

Considering the importance of effectively training employees on proper handling of tax-exempt applications, improvements in the timing and execution of future training are needed.

## Recommendation

The Commissioner, Tax Exempt and Government Entities Division, should:

**Recommendation 1:** Assess the timing and execution of training on political activities and incorporate any "lessons learned" into future training plans. The review should include, but not be limited to:

- Completing training on political activities earlier in the election cycle so employees can effectively apply it.

- Reviewing the methodology used to determine training attendance and requiring employees who miss more than the allotted time to retake the missed segments.

- Evaluating all phases of the political campaign intervention training as outlined in IRS policy to gather credible data to improve training, which should in turn lead to improved job performance.

**Management's Response:** The IRS agreed with this recommendation and states it has assessed and evaluated the delivery of initial training on political activities and will incorporate best practices and lessons learned into future training plans. Specifically, the IRS:

- Recognizes the importance of completing training on political activities earlier in an election cycle and will begin delivery of training on political activities by March 1 of election years.

- Concurrent with its increasing use of virtual e-Learning technology, has already identified improved methods to accurately track attendance by employees within the parameters of the technology. The IRS will apply this improved methodology and



***Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention***

procedures to determine training attendance and require employees who miss more than the allotted time to retake training sessions.

- Will use data gathered from its evaluation of the political activity training provided between May and August 2014 to improve the materials and processes for the next cycle of training, which it intends to deliver in March 2016.

***The IRS developed new procedures that address Prior Recommendation 4, but documentation was not complete for the two requests submitted to the Technical Unit***

**Prior Recommendation 4:**  *Develop a process for the Determinations Unit to formally request assistance from the Technical Unit and the Guidance Unit.*

**Prior audit results**

Organizations that applied for tax-exempt status and had their applications forwarded to the team of specialists experienced substantial delays.  Potential political cases took significantly longer than average to process due to ineffective management oversight.  Once cases were initially identified for processing by the team of specialists, the Determinations Unit program manager requested assistance via e-mail from the Technical Unit[23] to ensure consistency in processing the cases.  However, EO function management did not ensure that there was a formal process in place for initiating, tracking, or monitoring requests for assistance.  As a result, the Determinations Unit waited more than 20 months (February 2010 to November 2011) to receive draft written guidance from the Technical Unit for processing potential political cases.

**Current audit results**

The IRS issued an interim guidance memorandum creating a formal process for Determinations Unit specialists to request assistance from the Technical Unit.  All requests for technical assistance must be in writing and accompanied by a completed EO Technical Assistance Request Form and tracking sheet.  Specific time frames are included in the procedures for completing different steps in the process.  For example, the Technical Unit must acknowledge receipt of the request within two workdays and enter the request on the Technical Unit case tracking system.  Follow-up on the status of outstanding requests is required every 30 days, and the Technical Unit has up to 120 days to provide a response.  These new procedures adequately address our prior recommendation.

Between July 15, 2013, and August 26, 2014, documentation provided by the EO function showed that the Determinations Unit submitted two requests for technical assistance to the

---

[23] During our prior review, the IRS informed us that the Determinations Unit sought assistance from the Technical Unit.  The Technical Unit in turn worked with the Guidance Unit, which provides formal and informal guidance that explains how certain laws, such as regulations, revenue rulings, revenue procedures, notices, and announcements, may apply to tax-exempt organizations.



**Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention**

Technical Unit.  To help validate this number, we interviewed a statistically valid sample of 85 Determinations Unit employees and 31 of 35 Technical Unit employees[24] to determine if there were other technical assistance requests during this time frame.[25]  None of the employees interviewed identified any other requests.  Although the tracking sheets were incomplete for these two requests, the Technical Unit provided responses to the Determinations Unit for each of them within 40 days.  During our review, EO function management indicated that they reminded employees to complete all steps in the tracking process going forward.

### *The IRS has taken adequate corrective actions to address Prior Recommendation 5*

**Prior Recommendation 5:**  *Develop guidance for specialists on how to process requests for tax-exempt status involving potentially significant political campaign intervention.  This guidance should also be posted to the Internet to provide transparency to organizations on the application process.*

**Prior audit results**

The Determinations Unit stopped working on potential political cases in October 2010 while it waited for assistance from the Technical Unit.  Draft written guidance was not received from the Technical Unit until November 2011, which was 13 months after the Determinations Unit stopped processing the cases.  As of the end of our prior audit work in February 2013, the IRS had developed draft guidance (in the form of a guide sheet) that included issues that specialists should look for when processing potential political cases.[26]  The draft guide sheet had not been finalized because the EO function decided to provide training instead.

In its response to our prior report, the IRS proposed that the training developed as a result of other recommendations in the report would satisfy this recommendation.  TIGTA disagreed and believed that specific guidance should be developed and made available to specialists processing potential political cases.  Making this guidance available on the Internet for organizations could also address a concern raised in the IRS's response that many applications appear to contain incomplete and inconsistent information.[27]

**Current audit results**

After the prior audit report was issued in May 2013, the IRS implemented significant changes to the process for reviewing applications for tax-exempt status.  The IRS developed, internally

---

[24] Four employees were not interviewed because they had either retired, transferred to another part of the IRS, were on extended medical leave, or were under emotional stress.
[25] See Appendix I for our sampling methodology.
[26] Similar guide sheets involving other topics are available to the public on the IRS's website.
[27] In response to the National Taxpayer Advocate's *2007 Annual Report to Congress*, the IRS commented that putting guide sheets for processing applications for tax-exempt status on its Internet site would result in fewer delays.



**Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention**

issued, and posted guidance documents on the Internet in the form of interim guidance memorandums. One of these guidance documents was for an optional expedited process[28] for I.R.C. § 501(c)(4) organizations involving potential political campaign intervention that had already applied for tax-exempt status. Another updated the process for reviewing I.R.C. § 501(c)(3) applications for tax-exempt status. The IRS also developed a template with prewritten questions that specialists could choose from when preparing an additional information request letter. Specialists may adapt the prewritten questions or compose unique questions to solicit additional information from the applicant. This letter template is published on the Internet for the public.

The revised letter and all of the template questions went through a comprehensive review process prior to its implementation in January 2014. Subject matter experts from across the EO function, along with the Tax Exempt and Government Entities Division Chief Counsel Office, the Office of Taxpayer Correspondence, and the Office of the Taxpayer Advocate, reviewed the revised letter prior to implementation. In addition, the IRS revised its process to require managers or the Determinations Unit Quality Assurance group to review additional request letters involving potential political campaign intervention prior to issuance.

In December 2013, the IRS also expanded the optional expedited process to all organizations applying for I.R.C. § 501(c)(4) status whose applications indicate that the organizations may be involved in political campaign intervention or in providing private benefit to a political party. IRS officials decided to adopt this approach in part to address the backlog of cases identified in our prior review and because it resulted in the best use of taxpayer and Government resources. In addition, they thought that establishing a safe harbor provision in this area was consistent with the IRS's approach in other fact-specific areas in which reasonable people can disagree and the law is not well-developed.

Other types of organizations applying for tax-exempt status that may be involved in potential political campaign intervention activities are processed following the procedures for any application for tax-exempt status needing further development. The optional expedited process has not been offered to these organizations that may be involved in political campaign intervention and, as shown in Figure 3, according to the IRS have similar restrictions.

---

[28] The optional expedited process is discussed in more detail under the Prior Recommendation 2 subheading.



***Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention***

***Figure 3:  Common Tax Law Restrictions
on Activities of Tax-Exempt Organizations***

|  | 501(c)(4) | 501(c)(5) | 501(c)(6) |
|---|---|---|---|
| Receive tax-deductible charitable contributions | NO[29] | NO | NO |
| Receive contributions or fees deductible as a business expense | YES | YES | YES |
| Substantially related income exempt from Federal income tax | YES | YES | YES |
| Investment income exempt from Federal income tax | YES | YES | YES |
| Engage in legislative advocacy | YES | YES | YES |
| Engage in candidate election advocacy | LIMITED | LIMITED | LIMITED |
| Engage in public advocacy not related to legislation or election of candidates | YES | YES | YES |

*Source:  Excerpt from http://www.irs.gov/Charities-&-Non-Profits/Common-Tax-Law-Restrictions-on-Activities-of-Exempt-Organizations.*

The optional expedited process was established in the interest of effective and efficient tax administration and to assist in the transparent and consistent review of applications for tax-exempt status under I.R.C. § 501(c)(4).  While the IRS has closed many of the cases associated with its backlog of I.R.C. § 501(c)(4) applications, the optional expedited process remained in place as we were completing our audit work.  If the IRS permanently adopts the process and does not expand it to include other subsections, it may lead to inconsistent treatment and additional burden for those organizations filing under a different I.R.C. subsection.

Regardless of the type of organization applying for tax-exempt status, the IRS does not have guidance for measuring the primary activity of an organization.  Without a clearly defined test (sometimes referred to as a "bright-line" test) to measure the primary activity of an organization, the IRS uses the facts and circumstances approach to determine if an organization's political activities constitute its primary activity.

Because the Department of the Treasury is drafting guidance on how to measure the primary activity of I.R.C. § 501(c)(4) social welfare organizations, we are not making a recommendation related to providing guidance on processing applications for I.R.C. § 501(c)(4) tax-exempt status with potential political campaign intervention at this time.[30]

---

[29] The IRS stated that there are some exceptions to this restriction.
[30] The guidance is discussed in more detail under the Prior Recommendation 8 subheading.



*Status of Actions Taken to Improve*
*the Processing of Tax-Exempt Applications*
*Involving Political Campaign Intervention*

## Recommendation

**Recommendation 2**: If the optional expedited process for I.R.C. § 501(c)(4) organizations becomes a permanent process, the Director, EO, should consider providing this option to additional organizations with similar political campaign intervention limitations.

> **Management's Response**: The IRS agreed with this recommendation. If the optional expedited process for I.R.C. § 501(c)(4) organizations becomes a permanent process, the IRS will consider providing this option to additional organizations with similar political campaign intervention limitations. As part of its consideration, the IRS will evaluate data trends and consult with the Office of Chief Counsel (Tax Exempt and Government Entities Division) to ensure that any extension of the process is consistent with current statutory and regulatory requirements regarding political campaign intervention applicable to the type of I.R.C. § 501(c) organization under consideration.

### The IRS has taken adequate corrective actions to address Prior Recommendation 7

**Prior Recommendation 7**: *Provide oversight to ensure that potential political cases, some of which have been in process for three years, are approved or denied expeditiously.*

**Prior audit results**

Ineffective oversight by management led to significant delays in processing potential political cases. Draft written guidance was not provided by the Technical Unit until November 2011, 13 months after the Determinations Unit stopped processing the cases. Many organizations waited much longer than 13 months for a decision. For example, as of December 17, 2012, the IRS had been processing several potential political cases for more than 1,000 calendar days. For the 296 potential political cases we reviewed,[31] as of December 17, 2012, 108 applications had been approved, 28 were withdrawn by the applicant, none had been denied, and 160 cases were open from 206 to 1,138 calendar days (some crossing two election cycles).

**Current audit results**

We reviewed the 160 cases that were open as of December 17, 2012, to determine whether appropriate oversight is being provided to ensure that they are approved or denied expeditiously. As of December 4, 2014, 149 of the 160 open cases had been closed. Figure 4 shows how each of the 149 cases were closed. Figure 5 shows that for the 149 cases closed[32] since

---

[31] By December 17, 2012, two cases were no longer being processed by the team of specialists.
[32] For 136 cases we used the date the application was closed on the Employee Plans/Exempt Organizations Determination System as the closed date. For 13 cases, we used the determination letter issuance date as the closed date because the IRS stated it did not have resources to timely close the cases on the system. The fact that these cases were not administratively closed on the system did not affect the 13 organizations receiving tax-exempt status.



**Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention**

December 17, 2012, most were closed in one to three years, while a handful were closed in less than a year, and the remaining 22 cases took three to six years to close.

**Figure 4:  Closed Case Status**

| Closed Case Status | Total Cases |
|---|---|
| Approved | 107 (72%) |
| Failure to Establish[33] | 27 (18%) |
| Withdrawn by Applicant | 8 (5%) |
| Disapproved | 7 (5%) |
| **Total**: | **149** |

Source:  TIGTA analysis of case file and Employee Plans/Exempt Organizations Determination System data.

**Figure 5:  Total Length of Time Cases Were Open**

| Range of Elapsed Days From Postmark Date to Closing Date | Total Cases |
|---|---|
| Up to 1 year | 5 |
| More than 1 year to 2 years | 60 |
| More than 2 years to 3 years | 62 |
| More than 3 years to 4 years | 19 |
| More than 4 years to 5 years | ***1*** |
| More than 5 years to 6 years | ***1*** |
| **Total**: | **149**[34] |

Source:  TIGTA analysis of case file and Employee Plans/Exempt Organizations Determination System data.

---

[33] Instances in which applicants do not respond to requests for information.  The IRS sends the applicant a letter telling them the application is in suspense for 90 days.  If no response is received during that time, the case is closed as failure to establish and the applicant has to reapply to obtain tax-exempt status.  If the applicant responds within 90 days, the case is reactivated.

[34] The EO function indicated that 13 of 35 eligible applicants received Letter 948-e, *Determination Letter for Organizations Eligible Under the Optional Expedite Process*, granting them tax-exempt status because the organizations self-certified their eligibility for Section 501(c)(4) tax-exempt status.  The remaining applicants were not eligible for various reasons, *e.g.*, their application was closed before the optional expedited process began or the applicant was not requesting I.R.C. § 501(c)(4) status.



**Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention**

Figure 6 shows that for the 149 cases closed since December 17, 2012, 60 were closed between December 17, 2012, and May 14, 2013, (the date our prior report was issued).  The majority of the remaining closures were made within one year of the issuance of our prior report.

**Figure 6:  Length of Time Cases Were Open
Since Prior TIGTA Report Issuance**

| Range of Elapsed Days From TIGTA Report Date to Closing Date | Total Cases |
|---|---|
| Closed before TIGTA report issuance | 60 |
| Up to 1 year | 66 |
| More than 1 year to 1½ years | 23 |
| **Total**: | **149** |

*Source:  TIGTA analysis of case file and Employee Plans/Exempt
Organizations Determination System data.*

Figure 7 shows the status for the 11 cases open as of December 4, 2014.

**Figure 7:  Status of Cases That
Were Open as of December 4, 2014[35]**

| Current Status | Total Cases |
|---|---|
| Ongoing litigation | 6 |
| Proposed adverse determination or in Appeals | 5 |
| **Total**: | **11** |

*Source:  TIGTA analysis of case file and Employee Plans/Exempt
Organizations Determination System data.*

_Six cases involving litigation_

As of December 4, 2014, six of the open cases were related to applicants in litigation with the IRS.  Processing of these cases was suspended because of the litigation.  A determination letter or ruling on tax-exempt status ordinarily is not issued if an issue involving the organization's tax-exempt status under I.R.C. § 501 is pending in litigation.  If the IRS is able to make a determination on the tax-exempt status while the case is being litigated, the EO function can send the determination letter to the Department of Justice which chooses whether to issue it.[36]

---

[35] The IRS provided documentation on the day our draft report was issued that a proposed adverse determination was issued for a case previously under development.  We updated our results accordingly.
[36] The IRS informed us that the Department of Justice retains jurisdiction of cases involved in litigation with the IRS.



**Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention**

_Five cases involving proposed adverse determinations or in Appeals_

Five of the open cases involved instances in which organizations are entitled to protest a proposed determination or appeal a determination made by the IRS.  When the IRS proposes an adverse determination, officials from organizations applying for tax-exempt status are provided the opportunity to meet with IRS officials (referred to as a Conference of Right) to provide additional information in support of their application.  The IRS must consider the additional information provided by the applicant and either approve the application or address the additional information in its rationale for denying the application.  If the application is denied, the organization may appeal the EO function's decision to the Office of Appeals.

## The IRS has taken adequate corrective actions to address Prior Recommendation 8

**Prior Recommendation 8:**  _Recommend to IRS Chief Counsel and the Department of the Treasury that guidance on how to measure the "primary activity" of I.R.C. § 501(c)(4) social welfare organizations be included for consideration in the Department of the Treasury Priority Guidance Plan._

### Prior audit results

An internal IRS review determined that there appeared to be some confusion by Determinations Unit specialists and applicants on what activities are allowed by I.R.C. § 501(c)(4) organizations. We believe this could be due to the lack of specific guidance on how to determine the primary activity of an I.R.C. § 501(c)(4) organization.  Treasury Regulations state that I.R.C. § 501(c)(4) organizations should have social welfare as their primary activity; however, the regulations do not define how to measure whether social welfare is an organization's primary activity.

### Current audit results

Guidance was included for consideration in the _Department of the Treasury 2013–2014 Priority Guidance Plan_ on how to measure the primary activity of I.R.C. § 501(c)(4) social welfare organizations and the _Department of the Treasury 2014–2015 Priority Guidance Plan_ on proposed regulations under I.R.C. § 501(c) relating to political campaign intervention.  However, without finalized guidance, the IRS does not have a "bright line" test to measure the primary activity of an organization.  Unless the organization makes representations to the IRS under penalties of perjury regarding their past, current, and future activities as part of the optional expedited process, the IRS still uses the facts and circumstances method to make a determination of tax-exempt status.  Because the Department of the Treasury is in the process of drafting guidance, we are not making additional recommendations at this time.



**Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention**

**Appendix I**

# Detailed Objective, Scope, and Methodology

The overall objective of this review was to assess the IRS's actions in response to TIGTA's prior recommendations[1] to improve the identification and processing of applications for tax-exempt status involving political campaign intervention.[2]  To achieve this objective, we:

I.    Assessed corrective actions taken by the EO function in direct response to our prior Recommendation 1.

    A.    Reviewed documentation obtained, including all documents related to the Emerging Issues Committee (including any results to date), to obtain reasonable assurance that only activities, not names or policies, were considered in reviewing Emerging Issues Committee referrals.

    B.    Verified that the addition of any emerging issues was approved by the appropriate level of IRS management.

    C.    Selected and interviewed a statistically valid sample of 85 Determinations Unit and Quality Assurance first-line managers and employees responsible for processing applications for tax-exempt status from the population of 176 employees to determine if BOLO listings or similar listings were still in use and if they knew the criteria that should be considered when processing cases.  A statistical sample was used to allow the results to be projected to the overall population.  We relied on TIGTA's contract statistician to verify our sampling methods.  We calculated our sample size using a 90 percent confidence interval, 5 percent precision, and 10 percent estimated error rate as adjusted by the contract statistician.  Therefore, we are 90 percent confident that "at most" 2.67 percent of employees were still using BOLO listings or other similar listings to identify cases or issues for further review.  In addition, we are 90 percent confident that "at most" 6.15 percent of employees do not know what information to consider when determining if there was potential political campaign intervention.  The precision is based on a one-sided 90 percent confidence interval.

II.    Assessed the corrective actions taken by the EO function in direct response to our prior Recommendation 2.

    A.    Obtained and reviewed relevant documentation containing new procedures and guidance.

---

[1] TIGTA, Ref. No. 2013-10-053, *Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review* (May 2013).
[2] For the definition of "political campaign intervention" and other terms, see Appendix V.



***Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention***

B. Determined if new procedures address the intent of the prior recommendation.

C. Obtained and reviewed 12 applications that were worked by the Technical Unit after the optional expedited process was extended to all organizations applying for tax-exempt status under I.R.C. § 501(c)(4) in December 2013. We reviewed the associated case files to determine if there were indications of potential political campaign intervention documented in the case file before the case was transferred to the Technical Unit for review.

III. Assessed the corrective actions taken by the EO function in direct response to our prior Recommendations 3, 6, and 9, which all related to training.

A. Obtained documentation such as e-mails, memorandums, procedures, and guidance related to the corrective actions taken during the implementation of the recommendations.

B. Obtained the training module developed by the EO function and determined if it appropriately addressed our prior recommendations.

C. Determined if all applicable personnel were trained.

D. Determined if the EO function had a plan in place to effectively evaluate the adequacy of the training and assessed the EO function's efforts in evaluating the adequacy of the training.

E. Assessed when and how often this training or workshop would be offered to employees.

IV. Assessed the corrective actions taken by the EO function in direct response to our prior Recommendation 4.

A. Obtained and reviewed relevant documentation such as e-mails, memorandums, procedures, and guidance related to the corrective actions to determine if the new procedures are complete and logical.

B. Obtained and reconciled summary information to tracking sheets and actual requests to determine if requests were accounted for and addressed timely.

C. Selected and interviewed a statistically valid sample of 85 Determinations Unit and Quality Assurance first-line managers and employees responsible for processing applications for tax-exempt status from the population of 176 employees, and 31 Technical Unit first-line managers and employees from a population of 35 employees[3] to determine if any requests were not being tracked. A statistical sample was used to allow the results to be projected to the overall population. We

---

[3] Four employees were not interviewed because they had either retired, transferred to another part of the IRS, were on extended medical leave, or were under emotional stress.



**Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention**

relied on TIGTA's contract statistician to verify our sampling methods. We calculated our sample size using a 90 percent confidence interval, 5 percent precision, and 10 percent estimated error rate as adjusted by the contract statistician. Therefore, we are 90 percent confident that "at most" 2.67 percent of employees could identify technical assistance requests that were not being controlled. The precision is based on a one-sided 90 percent confidence interval.

V.   Assessed the corrective actions taken by the EO function in direct response to our prior Recommendation 5.

A.   Obtained documentation such as e-mails, memorandums, procedures, and guidance related to the corrective actions taken during the implementation of the recommendation.

B.   Assessed whether the guidance provided to specialists adequately addressed the recommendation and had been posted to the Internet.

VI.   Assessed the corrective actions taken by the EO function in direct response to our prior Recommendation 7.

A.   Obtained and reviewed documentation such as e-mails, memorandums, procedures, and guidance related to the corrective actions taken during the implementation of the recommendation to determine if the IRS adequately addressed the recommendation.

B.   Determined whether appropriate oversight was given to all relevant cases.

1.   Requested copies of case files to determine the current status of the cases.

2.   Reviewed open cases to determine if there were any delays in completing the cases.

VII.   Assessed the corrective actions taken by the EO function in direct response to our prior Recommendation 8.

A.   Obtained documentation such as e-mails, memorandums, procedures, and guidance and determined if the corrective action was completed.

B.   Reviewed the *Department of the Treasury 2013–2014 Priority Guidance Plan* and *Department of the Treasury 2014–2015 Priority Guidance Plan* to determine if guidance was being considered regarding how to measure whether social welfare is an organization's primary activity.



***Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention***

## *Internal controls methodology*

Internal controls relate to management's plans, methods, and procedures used to meet their mission, goals, and objectives.  Internal controls include the processes and procedures for planning, organizing, directing, and controlling program operations.  They include the systems for measuring, reporting, and monitoring program performance.  We determined that the following internal controls were relevant to our audit objective:  memorandums, procedures, and guidance issued in response to our prior report and training provided to Determinations Unit specialists.  We evaluated these controls by interviewing IRS officials and reviewing applicable documentation.



**Status of Actions Taken to Improve**
**the Processing of Tax-Exempt Applications**
**Involving Political Campaign Intervention**

**Appendix II**

# Major Contributors to This Report

Gregory D. Kutz, Assistant Inspector General for Audit (Management Services and Exempt Organizations)
Troy D. Paterson, Director
Thomas F. Seidell, Audit Manager
Margaret A. Anketell, Lead Auditor
Theresa M. Berube, Senior Auditor
Cheryl J. Medina, Senior Auditor
Julia Moore, Senior Auditor
Donald J. Martineau, Auditor
Michael A. McGovern, Auditor



***Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention***

**Appendix III**

# *Report Distribution List*

Commissioner  C
Office of the Commissioner – Attn:  Chief of Staff  C
Deputy Commissioner for Services and Enforcement  SE
Deputy Commissioner, Tax Exempt and Government Entities Division  SE:T
Director, Exempt Organizations, Tax Exempt and Government Entities Division  SE:T:EO
Chief Counsel  CC
National Taxpayer Advocate  TA
Director, Office of Legislative Affairs  CL:LA
Director, Office of Program Evaluation and Risk Analysis  RAS:O
Office of Internal Control  OS:CFO:CPIC:IC
Audit Liaison:  Director, Communications and Liaison, Tax Exempt and Government Entities
Division  SE:T:C&L



***Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention***

**Appendix IV**

# *Letter 5228*

Letter 5228 is sent to organizations applying for tax-exempt status under I.R.C. Section 501(c)(4) whose applications suggest they may be involved in political campaign intervention or in providing private benefit to a political party.



**Department of the Treasury**
**Internal Revenue Service**
P.O. Box 2508, Room 4106
Cincinnati, OH 45201

Date:

Employer ID number:

Person to contact:

Employee ID number:
Tel:
Fax:

Dear

The IRS has instituted an optional expedited process for certain organizations applying for recognition of exemption under Section 501(c)(4). Organizations can make representations to the IRS under penalties of perjury regarding their past, current, and future activities and receive a determination letter based on those representations.

If you choose to apply for this expedited process, complete and return pages 3-4, *Representations and Specific Instructions*. We will send you a favorable determination letter within 1 month of receipt of the signed representation.

Determination letters issued under the optional process will be based on the representations of the organization and may not be relied upon if the organization's activities are different from what is represented to the IRS. The representations are subject to verification on audit. Organizations that don't make the representations will have their applications reviewed based on the legal standards applied to all the facts and circumstances.

If you make the representations required for eligibility under this optional process and want to participate, please follow the instructions set forth at the end of this letter, *Optional Expedited Process for Certain Exemption Applications Under Section 501(c)(4)*. Send the signed representations within 45 days from the date of this letter to the address below:

      Internal Revenue Service
      P.O. Box 2508, Room 4106
      Cincinnati, OH 45201

You can send the information by fax to                    . Your fax signature becomes a permanent part of your filing. Do not send an additional copy by mail.

If you have questions, you can contact the person whose name and telephone number are listed at the top of this letter.

Thank you for your cooperation.

                  Sincerely,

**Letter 5228 (Rev. 9-2013)**
Catalog Number 64005T



**Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention**

**Optional Expedited Process for Certain Exemption Applications Under Section 501(c)(4)**

In the interest of effective and efficient tax administration and to assist in the transparent and consistent review of applications for tax-exempt status under Section 501(c)(4), the IRS is offering an optional expedited process for certain organizations that have submitted 501(c)(4) applications. This optional expedited process is currently available only to applicants for 501(c)(4) status whose applications indicate the organization could potentially be engaged in political campaign intervention or providing private benefit to a political party and that otherwise do not present any issues with regard to exempt status.

In this optional process, an organization will represent that it satisfies, and will continue to satisfy, set percentages with respect to the level of its social welfare activities and political campaign intervention activities (as defined in the specific instructions on pages 4-5). These percentage representations are not an interpretation of law but are a safe harbor for those organizations that choose to participate in the optional process.

Under this optional expedited process, an applicant will be presumed to be primarily engaged in activities that promote social welfare based on certain additional representations (on pages 3-4) made by the organization regarding its past, present, and future activities. Like the Form 1024 exemption application itself, these representations are signed on behalf of the organization under penalties of perjury. The IRS will send applicants that provide the representations a favorable determination letter within 1 month of receipt of the signed representations.

Importantly, this is an optional process. The standards and thresholds reflected in the representations are criteria for eligibility for expedited processing rather than new legal requirements. No inference will be drawn from an organization's choice not to participate. An organization that declines to make the representations will have its application reviewed under the regular process in which the IRS looks to all facts and circumstances to determine whether an organization primarily engages in activities that promote social welfare.

Like all organizations receiving a favorable determination of exempt status, organizations participating in this optional expedited process may be subject to examination by the IRS and the organization's exempt status may be revoked if, and as of the tax year in which, the facts and circumstances indicate exempt status is no longer warranted. An organization that receives a determination letter under this expedited process may rely on its determination letter as long as its activities are consistent with its application for exemption and the representations, the applicable legal standards have not changed, and the determination letter is not revoked. The determination letter will expressly indicate that the letter was based on the representations. An organization may no longer rely on the determination letter issued under this optional expedited process as of the tax year in which its activities (including the amount of expenditures incurred or time spent on particular activities) cease to be consistent with its application for exemption and any of the representations. If the organization determines that it continues to be described in Section 501(c)(4), notwithstanding the fact that its activities are no longer consistent with the representations below, it may continue to take the position that it is described in Section 501(c)(4) and file Form 990, *Return of Organization Exempt From Income Tax*, but it must notify the IRS about such representations ceasing to be correct on Schedule O, *Supplemental Information*, of the Form 990.

**Letter 5228 (Rev. 9-2013)**
Catalog Number 64005T



**Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention**

**Representations and Specific Instructions**

1. During each past tax year of the organization, during the current tax year, and during each future tax year in which the organization intends to rely on a determination letter issued under the optional expedited process, the organization has spent and anticipates that it will spend 60% or more of *both* the organization's total expenditures *and* its total time (measured by employee and volunteer hours) on activities that promote social welfare (within the meaning of Section 501(c)(4) and the regulations thereunder).

2. During each past tax year of the organization, during the current tax year, and during each future tax year in which the organization intends to rely on a determination letter issued under the optional expedited process, the organization has spent and anticipates that it will spend 40% or less of both the organization's total expenditures and its total time (measured by employee and volunteer hours) on direct or indirect participation or intervention in any political campaign on behalf of (or in opposition to) any candidate for public office (within the meaning of the regulations under Section 501(c)(4)).

**Specific instructions**

For purposes of these representations, "total expenditures" include administrative, overhead, and other general expenditures. An organization may allocate those expenditures among its activities using any reasonable method.

For purposes of these representations, activities that promote social welfare do not include any expenditure incurred or time spent by the organization on:

- Any activity that benefits select individuals or organizations (including a political party) rather than the community as a whole;

- Direct or indirect participation or intervention in any political campaign on behalf of (or in opposition to) any candidate for public office;

- Operating a social club for the benefit, pleasure, or recreation of the organization's members; and

- Carrying on a business with the general public in a manner similar to organizations operated for profit.

For purposes of these representations, direct or indirect participation or intervention in any political campaign on behalf of (or in opposition to) any candidate for public office ("candidate") includes any expenditure incurred or time spent by the organization on:

- Any written (printed or electronic) or oral statement supporting (or opposing) the election or nomination of a candidate;

- Financial or other support provided to (or the solicitation of such support on behalf of) any candidate, political party, political committee, or Section 527 organization;

- Conducting a voter registration drive that selects potential voters to assist on the basis of their preference for a particular candidate or party;

- Conducting a "get-out-the-vote" drive that selects potential voters to assist on the basis of their preference for a particular candidate or (in the case of general elections) a particular party;

- Distributing material prepared by a candidate, political party, political committee, or Section 527 organization; and

- Preparing and distributing a voter guide that rates favorably or unfavorably one or more candidates.

Page 3

**Letter 5228 (Rev. 9-2013)**
Catalog Number 64005T



**Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention**

In addition, *solely* for purposes of determining an organization's eligibility under this optional expedited process, direct or indirect participation or intervention in any political campaign on behalf of (or in opposition to) any candidate includes any expenditure incurred or time spent by the organization on:

- Any public communication within 60 days prior to a general election or 30 days prior to a primary election[1] that identifies a candidate in the election. For this purpose, "public communication" means a communication by means of any broadcast, cable, or satellite communication; newspaper, magazine, or other periodical (excluding any periodical distributed only to the organization's dues paying members); outdoor advertising facility, mass mailing, or telephone bank to the general public; and communications placed for a fee on another person's Internet website;

- Conducting an event at which only one candidate is, or (in case of a general election) candidates of only one party are, invited to speak; and

- Any grant to an organization described in Section 501(c) if the recipient of the grant engages in political campaign intervention.[2]

Although other activities may constitute direct or indirect participation or intervention in a political campaign (see Revenue Ruling 2007-41 for examples of factors to consider), representations may be based on the specific activities described in these instructions.

*Under penalties of perjury, I declare that I am authorized to sign these representations on behalf of the above organizations, and that to the best of my knowledge and belief, the facts stated in the representations are true, correct, and complete.*

_____     _____

Signature of officer, director, trustee or other authorized official     Date

_____

Title and printed name

_____

Organization name and Employer Identification Number

---

[1] For purposes of these representations, the term "general election" includes a special or runoff election for the office sought by the candidate, and the term "primary election" includes a convention or caucus of a political party that has authority to nominate a candidate for the office sought.

[2] An organization may rely on a representation from an authorized officer of the recipient if the organization does not know whether the recipient engages in any political campaign intervention and may assume that a Section 501(c)(3) organization does not engage in political campaign intervention.

Page 4

**Letter 5228 (Rev. 9-2013)**
Catalog Number 64005T



**Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention**

**Appendix V**

# Glossary of Terms

| Term | Definition |
|---|---|
| **Be On the Look Out** | BOLO listings included a consolidated list of emerging issues the EO function identified for dissemination to Determinations Unit specialists. |
| **Bright Line** | A bright-line test is a clear division between what is acceptable and what is not from a legal, accounting, or regulatory perspective. |
| **General Advocacy** | An organization engages in general advocacy when it attempts to: 1) influence public opinion on issues germane to the organization's tax-exempt purposes, 2) influence nonlegislative governing bodies, *e.g.*, the executive branch or regulatory agencies, or 3) encourage voter participation through "get out the vote" drives, voter guides, and candidate debates in a nonpartisan, neutral manner. General advocacy basically includes all types of advocacy other than political campaign intervention and lobbying. |
| **Optional Expedited Process** | The IRS designed an optional expedited process in which Determinations Unit specialists send a letter to organizations whose I.R.C. § 501(c)(4) applications indicate potential political campaign intervention. The letter allows the applicant to represent, under penalty of perjury, that it will spend 40 percent or less of both expenditures and time on non–social welfare activities, *e.g.*, political campaign intervention. If an organization makes this representation, the application for tax-exempt status will be approved. |
| **Political Campaign Intervention** | Political campaign intervention is the term used in Treasury Regulations. For example, I.R.C. § 501(c)(3) charitable organizations are prohibited from directly or indirectly participating in or intervening in any political campaign on behalf of or in opposition to any candidate for public office. |
| **Priority Guidance Plan** | The Department of the Treasury issues a Priority Guidance Plan each year to identify and prioritize the tax issues that should be addressed through regulations, revenue rulings, revenue procedures, notices, and other published administrative guidance. |



***Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention***

| Term | Definition |
|------|-----------|
| **Safe Harbor** | The safe harbor option will provide certain groups an approved determination letter granting them I.R.C. § 510(c)(4) status within two weeks if they certify they devote 60 percent or more of both their spending and time on activities that promote social welfare as defined by I.R.C. § 501(c)(4).  At the same time, they must certify that political campaign intervention involves less than 40 percent of both their spending and time.  These thresholds apply for past, current, and future years of operations. |



**Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention**

**Appendix VI**

# Management's Response to the Draft Report



DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

COMMISSIONER
TAX EXEMPT AND
GOVERNMENT ENTITIES
DIVISION

March 5, 2015

MEMORANDUM FOR MICHAEL E. McKENNEY
DEPUTY INSPECTOR GENERAL FOR AUDIT

FROM:          Sunita B. Lough
               Commissioner, Tax-Exempt and Government Entities Division

SUBJECT:       Draft Audit Report – Status of Actions Taken to Improve the
               Processing of Tax Exempt Applications Involving Political
               Campaign Intervention (Audit # 201410009)

Thank you for the opportunity to review your draft audit report titled: "Status of Actions Taken to Improve the Processing of Tax Exempt Applications Involving Political Campaign Intervention (Audit # 201410009)."

We appreciate TIGTA's acknowledgment that the IRS, and in particular the Exempt Organization function (EO), has taken significant actions to address the recommendations made by TIGTA in its May 2013 report. TIGTA's draft report concludes that these corrective actions adequately address most of those recommendations. Specific responses to TIGTA's recommendations are provided in the attachment at the end of this response.

In addition to the actions EO has already taken in response to the May 2013 report, EO also initiated a large-scale overview of all of its processes and procedures in an effort to improve how all applications for tax-exempt status are handled, not just those with potential political campaign intervention activities. For example, TIGTA notes in its report the overall cycle times for processing cases with potential political campaign intervention activities. The timeframes provided by TIGTA primarily reflect historic case processing delays from prior to the implementation of a variety of processing improvement measures.

As well as implementing new processes and procedures to provide oversight to ensure that potential political cases could be approved or denied as expeditiously as possible while affording organizations additional administrative protections, starting in April 2014, EO also put in place a streamlined process that simplified and accelerated handling of all applications.

1



**Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention**

EO assigned and trained additional tax examiners from the Tax-Exempt and Government Entities (TE/GE) and Wage and Investment (W&I) business operating divisions to help process the backlog of applications, and issued Interim Guidance to formalize new instructions and bring clarity to the determinations process. In July 2014, EO debuted the Form 1023-EZ, a streamlined application for recognition of exemption under section 501(c)(3) of the Internal Revenue Code (IRC), available for use by certain smaller organizations. Using these improved processes and tools, EO has succeeded in reducing the inventory of cases that were more than 270 days old by 91 percent from 54,564 to 4,791 between April 2014 and September 2014. Further, EO closed more than 117,000 application cases in 2014, 120 percent over the previous fiscal year's total closings. As of February 2015, the average age of inventory in EO Rulings & Agreements was 124 days. As a result of these efforts, cycle times have been drastically reduced for all cases, including those with potential political campaign intervention activities.

TIGTA states in its report that as of December 4, 2014, EO has issued determinations on 149 of the 160 applications for tax-exempt status that were part of the initial TIGTA review of 298 applications and that were still open as of December 2012. In Figure 7, TIGTA describes the status of the remaining 11 cases. The figure does not reflect that two of the six cases identified as being in ongoing litigation have been issued determination letters by the Department of Justice (DOJ). Accordingly, as of February 3, 2015, only nine cases remain open. Below is a chart updating Figure 7 found in the TIGTA report:

### Status for Cases Open as of February 3, 2015

| Current Status | Total Cases |
|---|---|
| Ongoing Litigation | 4 |
| Proposed adverse determination or in Appeals | 5 |
| Total: | 9 |

TIGTA concludes that EO has taken adequate corrective action to provide oversight to ensure that potential political cases, including those above, are approved or denied expeditiously. A contributing factor to EO's resolution of these cases was the implementation of the optional expedited process. This process permits IRC § 501(c)(4) organizations whose only remaining issues are potential political campaign intervention activities or private benefit to a political party to make representations to the IRS under penalties of perjury regarding their past, current, and future activities. These applicants receive a determination letter based on those representations. Since the process was announced in June 2013, EO has regularly updated its website with information on the status of the program. Based on the initial effectiveness of the process, it was expanded in December 2013 to include a wider range of IRC § 501(c)(4) organizations.

2



**Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention**

In reference to the optional expedited process, TIGTA states that EO had not issued guidance on revisions to the optional expedited process as of the time audit work concluded on December 4, 2014. Subsequent to the conclusion of TIGTA's audit work, EO issued Interim Guidance Memorandum TEGE-07-1214-0032 (December 23, 2014) for cases under the expanded optional expedited process. This guidance is in addition to the updated Interim Guidance contained in Interim Guidance Memorandum TEGE-07-0714-0022 (July 28, 2014) for the original optional expedited process. These interim guidance memoranda, along with additional information regarding the process, are publicly available on our webpage.

The current TIGTA report acknowledges that "the optional expedited process was established in the interest of effective and efficient tax administration and to assist in the transparent and consistent review of applications for tax exempt status under I.R.C. § 501(c)(4)." EO will work with the Office of Chief Counsel (TE/GE) as it explores the long-term implementation of this process and any limitations inherent in various code subsections that may impact whether it would be appropriate to extend this program to other types of organizations. In doing so, we understand that, if the optional expedited process is permanently established, we need to ensure the consistent treatment of organizations applying for determinations under other subsections of section 501(c).

TIGTA also recognizes in its report other significant changes made by EO in processing applications, such as the implementation of template questions that specialists can choose from when preparing an additional information request letter. This template, which is part of Letter 1312, is available on our webpage. These questions focus on various activities that may constitute political campaign intervention and whether the organization is potentially providing a private benefit to a political party or candidate.

Letter 1312, Request for Additional Information, also contains similar template questions for a broad range of activities and issues that may be present in applications for tax-exempt status, not just those with potential political campaign intervention activities. As TIGTA notes, all of these questions underwent an extensive review and approval process prior to implementation. By providing this information both internally and externally, EO is ensuring consistency while at the same time providing transparency to and setting expectations for organizations on the types of information requests they may receive when applications are missing information that fully describes the organizations' operations.

In addition to the improvements made by EO in processing all applications for tax-exempt status, EO also developed and delivered training to all Rulings & Agreements employees (over 200 individuals) regarding political campaign intervention activities in 2014. Although budgetary constraints prevented EO from being able to deliver all sessions of this training in a face-to-face environment, EO was able to utilize an online training environment that allowed employees to interact with each other and presenters. This training was one of the largest e-Learning efforts ever initiated by EO.

3



**Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention**

As a result of this first broad experience with virtual training, EO has discovered some limitations in its e-Learning software. We agree with TIGTA's observation that adjustments in the timing and execution of future training can be made. To this end, EO has already begun to implement measures meant to mitigate the inherent issues that result when training must be delivered primarily in an e-Learning environment. These measures are based on information gathered and evaluations made regarding the effectiveness of the training provided in 2014.

For example, in evaluating issues with session attendance, EO determined that there were instances where employees had difficulties connecting to the sessions because of server issues and because of the number of users attempting to log in to the platform simultaneously. EO also determined that some employees who attended sessions were not given credit for having attended the session if they did not exit the event properly. As a result of its ongoing review of training processes, EO has made modifications to its methodology for monitoring attendance. EO will also ensure that clearer instructions are provided to employees on how to enter and exit sessions. These steps will assist in mitigating the limitations identified above.

Similarly, EO did not utilize a formal Level 1 evaluation process through the Enterprise Learning Management System (ELMS), which would assess the immediate reaction of learners to the training. However, EO did conduct a type of Level 1 assessment by requesting feedback on the e-Learning platform immediately following each module. These immediate evaluations captured information from employees on whether the session was beneficial, the portions that were the most and least beneficial, and any other comments or feedback that learners wished to provide. This information was compiled and provided to course instructors prior to the start of the next session. As a result of the feedback, modifications were made when necessary between sessions.

Additionally, since TIGTA completed its audit fieldwork, EO has administered a Level 3 (Impact on Job Performance) evaluation to all employees within the timeframe set forth in the Internal Revenue Manual (IRM). Going forward, EO will assess methods for incorporating both informal assessments, which allow for immediate feedback, and formal assessments administered through ELMS.

We appreciate having the opportunity to review and comment on the draft report and your recognition of the significant actions we have taken as a result of your prior report. Attached is a detailed response outlining our corrective actions to address your current recommendations. If you have any questions, please contact me, or a member of your staff may contact Tamera L. Ripperda, Director, Exempt Organizations, at (513) 263-5800.

Attachment

4



**Status of Actions Taken to Improve
the Processing of Tax-Exempt Applications
Involving Political Campaign Intervention**

Attachment

**Corrective Actions for TIGTA Draft Audit Report – Status of Actions Taken to
Improve the Processing of Tax Exempt Applications Involving Political
Campaign Intervention (Audit # 201410009)**

**RECOMMENDATION 1:**
"The Commissioner, Tax Exempt and Government Entities Division, should:
Assess the timing and execution of training on political activities and incorporate
any 'lessons learned' into future training plans.  The review should include, but not
be limited to:
- Completing training on political activities earlier in the election cycle so
  employees can effectively apply it.
- Reviewing the methodology used to determine training attendance and
  requiring employees who miss more than the allotted time to retake the
  missed segments.
- Evaluating all phases of the political campaign intervention training as
  outlined in IRS policy to gather credible data to improve training, which
  should in turn lead to improved job performance."

**CORRECTIVE ACTION:**
We have assessed and evaluated the delivery of our initial training on political
activities and will incorporate best practices and lessons learned into future training
plans.  Specifically,
- We recognize the importance of completing training on political activities
  earlier in an election cycle and will begin delivery of training on political
  activities by March 1 of election years.*
- Concurrent with our increasing use of virtual e-Learning technology, we have
  already identified improved methods to accurately track attendance by
  employees within the parameters of the technology.  We will apply this
  improved methodology and procedures to determine training attendance and
  require employees who miss more than the allotted time to retake training
  sessions.
- We will use data gathered from our evaluation of the political activity training
  provided between May and August 2014 to improve the materials and
  processes for the next cycle of training, which we intend to deliver in March
  2016.

**IMPLEMENTATION DATE:**
We will begin delivery of training on political activities by March 1 of election years.*

*For purposes of this Corrective Action, "election year" includes the day set by law for the
general elections of public officials (general elections are those elections in which all or most
members of a given political body are chosen.  For federal offices, election day occurs only in
even-numbered calendar years.  The IRS Exempt Organizations function will incorporate this
training into its fiscal year training plan in each calendar year in which a general election is
held, or biennially, beginning in FY 2014.

5



*Status of Actions Taken to Improve*
*the Processing of Tax-Exempt Applications*
*Involving Political Campaign Intervention*

**RESPONSIBLE OFFICIAL(S):**
Director, Exempt Organizations, Tax-Exempt and Government Entities Division

**CORRECTIVE ACTION MONITORING PLAN:**
IRS will monitor this corrective action as part of our internal management system of controls.

**RECOMMENDATION 2:**
"If the Optional Expedited Process for I.R.C. § 501(c)(4) organizations becomes a permanent process, the Director, EO, should consider providing this option to additional organizations with similar political campaign intervention limitations."

**CORRECTIVE ACTION:**
If the Optional Expedited Process for IRC § 501(c)(4) organizations becomes a permanent process, we will consider providing this option to additional organizations with similar political campaign intervention limitations.  As part of our consideration, we will evaluate data trends and consult with the Office of Chief Counsel (TE/GE) to ensure that any extension of the process is consistent with current statutory and regulatory requirements regarding political campaign intervention applicable to the type of IRC § 501(c) organization under consideration.

**IMPLEMENTATION DATE:**
December 31, 2016

**RESPONSIBLE OFFICIAL(S):**
Director, Exempt Organizations, Tax-Exempt and Government Entities Division

**CORRECTIVE ACTION MONITORING PLAN:**
IRS will monitor this corrective action as part of our internal management system of controls.

6